# THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| KARLA ANN MOYERS, | ) | Case No. 05-6060 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| KARLA ANN MOYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 07-29 |
| | ) | |
| FAIR COLLECTIONS AND OUTSOURCING, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | | |

## **MEMORANDUM OPINION**

Karla Ann Moyers (the "Debtor") filed this adversary proceeding against Fair Collections and Outsourcing, Inc. ("FCO"), for alleged violations of the Bankruptcy Code's automatic stay and discharge injunction. According to the Debtor, FCO attempted to collect a debt after she filed bankruptcy, and it failed to timely update the status of that debt with credit reporting agencies. FCO seeks entry of summary judgment on the basis that the uncontested facts of this case are insufficient support the Debtor's stated causes of action. The court agrees.

### I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of proving that there is no

genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A fact is not "genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

Before filing her October 14, 2005 Chapter 7 bankruptcy petition, the Debtor owed a $270 debt to Crane Meadow Apartments I, LP and/or Silverwood Management Inc. (collectively, "Crane Meadow").[1] In 2004, Crane Meadow referred that debt to Pierce, Hamilton & Stern for collection. Pierce, Hamilton & Stern was operated by two brothers. The two brothers agreed to terminate the company and form two new entities. As of October 1, 2005, Pierce Hamilton & Stern ceased to exist; one of the new entities, FCO, retained Crane Meadow as a client.

After October 1, 2005, FCO began the process of removing Pierce, Hamilton & Stern's name as the collection agent for sundry debts with the various credit reporting agencies. To effectively transfer the debts to FCO, Michael Sobata, FCO's president, testified that Pierce, Hamilton, & Stern had to terminate all credit reporting information by it, which, with regard to the Debtor's account, was accomplished on November 4, 2005. FCO then re-reported the debt as being owed, and it listed

---

[1] Both Crane Meadow Apartments, I, LP, and Silverwood Management Inc., were dismissed from this case with prejudice on January 7, 2008.

-2-

itself as the collection agent. With regard to the $270 owed by the Debtor to Crane Meadow, this was accomplished on January 3, 2006. FCO reported the status of the account as being a bad debt.

When the Debtor filed her October 14, 2005 Chapter 7 bankruptcy case, she did so without being represented by an attorney. On Schedule F, she listed a $270 debt as being owed to Pierce, Hamilton & Stern, with an address of 6931 Arlington Road, Suite 400, Bethesda, MD 20814-5213. The address on the mailing matrix filed by the Debtor on October 31, 2005, however, listed Pierce, Hamilton & Stern as being located in Upper Darby, Pennsylvania – not Bethesda, Maryland. Consequently, when the court sent its November 3, 2005 notice of the Debtor's meeting of creditors to all parties listed on the Debtor's mailing matrix, the mailing to Pierce, Hamilton & Stern was returned to the court on November 14, 2005, with the notation that there was no such number or street address in Upper Darby, Pennsylvania.

On December 22, 2005, the Debtor filed an amended Schedule F, and an amended mailing matrix, which again listed the $270 debt owed to Pierce, Hamilton & Stern at the Bethesda, Maryland address. The Debtor, however, failed to serve a copy of the amendment on affected creditors. Because the address for Pierce, Hamilton & Stern that was listed in amended Schedule F was the same as that listed in original Schedule F, the Debtor's attempt to correct her original mistake in the mailing matrix was not apparent to the Bankruptcy Clerk's office; consequently, the mailing matrix was unchanged, and no further notices in the case were sent to Pierce, Hamilton & Stern.

On March 2, 2006, FCO sent a collection letter to the Debtor. On March 27, 2006, the Debtor mailed FCO a letter informing it that: (1) the Debtor had filed bankruptcy, (2) its attempt to collect the debt was in violation of the Bankruptcy Code's automatic stay, and (3) continued contact with the Debtor with regard to collection of that debt would result in a lawsuit filed against in the bankruptcy court. FCO immediately canceled the Debtor's collection account in its business records, which initiated an automated process for updating FCO's reports to the credit bureaus. As explained by FCO's president:

> A:   We report our files to the credit bureaus on a monthly basis. And so we report it to the credit bureau and that this account has been canceled, take it off forever, and that was that. . . .
> . . . .
> Q:   . . . . You could report it everyday [?]

> A: No, the credit bureaus don't want a report everyday.
> Q: . . . . I asked [if] you could report everyday.
> . . . .
> A: We could report everyday via a manual method.
> Q: You could report weekly too, correct?
> A: If via a manual method. So if we wanted to report debtors manually, the potential for error would go up exponentially, dramatically and incredibly.
> . . . .
> Q: What leads you to believe that . . . a . . . debtor would have any idea of what the difference between manual deletion and automatic deletion or even how your system works . . . ?
> A: Well, I can tell you this . . . . We know that we report each month to the credit bureau, but we don't know when the exact date is going to be of the next transmission. That is not compliance's job. Compliance isn't IT, the information technology department sends the data each month to the credit bureaus. The compliance department cancels the debt and the system knows that any canceled debt gets picked up and transmitted to the credit reporting agency. . . .
> . . . .
> And the reason we do it in an automated fashion is because we're dealing with thousands of new accounts a month. We're dealing with 8,000 new accounts a month, and it's a lot of data. And the best way to deal with it is in an automated fashion with the system. . . .

(Sobata Depo. pp. 154-66).

Accordingly, FCO did not automatically update the status of the Debtor's account with the credit reporting bureaus until May 11, 2006. On June 2, 2006, the Debtor obtained a copy of her credit report. The debt owing to Crane Meadow / FCO was not reported by Experian or Equifax, but it was listed as an open account with Transunion.

The Debtor obtained her Chapter 7 discharge on March 23, 2006.

### III. DISCUSSION

The Debtor's assertion that FCO violated the automatic stay and/or the Bankruptcy Code's discharge injunction is based on three events: (1) the January 3, 2006 report to the credit bureaus that the Debtor owed money to Crane Meadow, (2) the March 2, 2006 collection letter sent to the Debtor by FCO, and (3) FCO's purported failure to timely update the Debtor's collection account with the various credit reporting agencies until May 11, 2006.

When a debtor asserts that a creditor has violated the automatic stay, the debtor must

-4-

establish that the creditor's violation was willful. 11 U.S.C. § 361(k)[2] ("[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages . . . ."). When a party does not receive notice of a bankruptcy filing the creditor cannot commit a willful violation of the automatic stay. *E.g.*, *In re Preston*, 333 B.R. 346, 349 (Bankr. M.D.N.C. 2006) ("Without notice of the bankruptcy filing, Mr. Preston could not have willfully violated the automatic stay."); *Glaser v. Chelec, Inc. (In re Glaser)*, 01-10220, 2002 Bankr. LEXIS 1816 at *52 (Bankr. E.D. Va. Oct. 25, 2002) ("Where an offending party is ignorant of the bankruptcy filing itself, actions taken in unwitting violation of the stay . . . would not support a finding of contempt or a recovery of damages . . . .").

Here, the Debtor listed the wrong address for Pierce, Hamilton & Stern / FCO on her initial mailing matrix, and failed to serve a copy of her amended Schedule F on Pierce, Hamilton & Stern / FCO. Consequently, FCO did not have any notice that the Debtor filed bankruptcy when it reported the debt owed by the Debtor to Crane Meadow on January 3, 2006, or when it sent the Debtor a collection letter on March 2, 2006. Because FCO was without knowledge of her bankruptcy filing, neither event constitutes a "willful" violation of the automatic stay that would entitle the Debtor to damages.[3]

Of course, the Debtor provided FCO with knowledge of her bankruptcy filing when she sent her March 27, 2006 letter to FCO informing it that she had filed bankruptcy and that any further collection efforts by it would result in a lawsuit for damages. As testified to by FCO's president, however, FCO immediately ceased collection activity on the account after receiving the letter.

While FCO did not update the Debtor's account information with the various credit reporting agencies until May 11, 2006, in the court's view, this delay does not constitute a violation of the Debtor's discharge injunction. After discovery, the Debtor has not produced any evidence to contradict the testimony of FCO's president that the industry standard is to report collection

---

[2] The Debtor's case was filed on October 14, 2005. Effective on October 15, 2005, the applicable subsection for claiming damages for a violation of the automatic stay was moved from § 362(h) to § 362(k). Because the changes rendered to the statutory language do not affect this case, the court will refer only to § 362(k) as a matter of convenience.

[3] Because the Debtor did not receive a discharge until March 23, 2006, the discharge injunction of 11 U.S.C. § 524 was not yet in place.

information on a monthly basis. Likewise, construing all facts in a light most favorable to the Debtor, the court finds insufficient evidence to suggest that FCO was engaged in a type of "trap hunting" by willfully refusing to update the Debtor's credit bureau information in the hopes that the Debtor would pay the amount owed in lieu of taking steps to remove the bad debt reference from her credit reports. *See, e.g.*, *Puller v. Credit Collections USA, Inc. (In re Puller)*, No. 05-1881, 2007 Bankr. LEXIS 2017 at *23 (Bankr. N.D.W. Va. June 20, 2007) ("To the extent that the Debtor can prove that Credit Collections intentionally failed to report, or intentionally delayed reporting, updated collection information in the hopes that the Debtor may voluntarily repay her discharged debt in an effort to clean-up the Debtor's credit report, then such actions may be viewed as setting a trap for the Debtor and then lying in wait to see if the bait is taken. In this court's view, trap hunting can constitute a violation of the discharge injunction [and the Debtor has therefore stated a cause of action].").

With regard to the Debtor's June 2, 2006 Transunion credit report, which, unlike Experian or Equifax, continued to report the $270 account as a bad debt, the Debtor failed to elicit any evidence that Transunion was continuing to report the debt as owing based on action (or inaction) taken by FCO. The only testimony in this regard was elicited from FCO's president. He testified that FCO reports its files to the credit bureaus by an automated process on a monthly basis. No indication in the record exists that FCO intentionally updated the status of the account with some, but not all, of the applicable credit bureaus.

## IV. CONCLUSION

In sum, FCO has established on summary judgment that it did not have knowledge or notice of the Debtor's bankruptcy filing until the Debtor mailed it a March 27, 2006 letter. On receipt of that letter, FCO cancelled all collection activity and took the necessary steps to update the collection account with the various credit reporting agencies. The Debtor has not presented any sufficient contravening evidence that could create a genuine issue of material fact as to whether FCO was wilfully attempting to collect a debt after receiving notice of the Debtor's bankruptcy. Consequently, the court will grant FCO's motion for summary judgment and will dismiss this case.[4]

---

[4] While the court does not find a violation of the automatic stay or discharge injunction under the circumstances of this case, it cannot allow the moment afforded by this Memorandum

A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

---

Opinion to pass without further comment. Forty-five days to update a credit reporting agency account hardly seems acceptable in this much heralded age of information technology and automated information exchange. Credit reports loom ever more ominously on the national landscape. They are used for a multitude of critical purposes ranging from obtaining loans to qualifying for employment. Given the increasing importance that is attributed to an individual's credit report and credit score, the lag time in the transmission of updated credit information evidenced in this case is, at best, disheartening. Thus, while the court is unable to find an actionable bankruptcy violation by FCO, it is by no means endorsing its business model, or its internal procedures.